UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BALJIT SINGH,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>RON RACKLEY, Warden,<br><br>　　　　Respondent. | No. 2:16-cv-2517 KJM AC<br><br>FINDINGS AND RECOMMENDATIONS |

　　　　Petitioner is a California state prisoner proceeding with counsel on an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action proceeds on a petition challenging petitioner's 2011 conviction for second degree murder. ECF No. 1. Respondent has answered, ECF No. 11, and petitioner has filed a traverse, ECF No. 13.

## BACKGROUND

　　I.　　Proceedings In the Trial Court

　　　　A. Preliminary Proceedings

　　　　Petitioner was charged in San Joaquin County with killing his wife, who had been stabbed to death on December 23, 2009. The information charged petitioner with murder (Cal. Penal Code § 187(a)) and alleged that he used a knife to commit the murder (former Cal. Penal Code § 12022(b)(1)).  1 CT 1-2.[1]

---

[1] "CT" refers to the Clerk's Transcript on Appeal, which is in three volumes (Lodged Docs. 1 through 3). "RT" refers to the Reporter's Transcript on Appeal, which is in five volumes

On December 30, 2009, criminal proceedings were suspended pursuant to Cal. Penal Code § 1368, for evaluation of petitioner's competency. 1 CT 4-5. A jury trial was held on the question of competency commencing on March 11, 2010. 1 CT 37-48. On March 22, 2010, the jury found petitioner competent to stand trial. 1 CT 49.

A preliminary hearing was held on April 1 and 2, 2010. 1 CT 109 – 2 CT 285. Petitioner was represented at the hearing by Joel Deckler. 1 CT 109. Although counsel strongly advised against it, 1 CT 205-206, 254, petitioner testified at the preliminary hearing. 1 CT 258 – 2 CT 281. Petitioner was held to answer on the charges. 2 CT 281-282.

Following the preliminary hearing, Mr. Decker (who had been retained through the preliminary hearing only) was relieved and Deputy San Joaquin County Public Defender Rose Cardoso was appointed to represent petitioner.

On June 7, 2010, petitioner entered pleas of not guilty and not guilty by reason of insanity. 2 CT 290.

Prior to trial, petitioner rejected an offer to plead guilty to voluntary manslaughter in exchange for a twelve-year sentence. Petitioner's lawyer had strongly advised him to take the deal, in light of the evidence against him and the likelihood of a murder conviction. Lodged Doc. 10 (Reporter's Transcript of Sealed Proceedings) at 11-13.

Petitioner brought a total of five <u>Marsden</u> motions[2] prior to and during the course of the trial. Lodged Doc. 10 (Reporter's Transcript of Sealed Proceedings). All were denied. <u>Id.</u>[3]

B. The Evidence Presented at Trial

   1. Guilt Phase

The evidence at trial established the following facts.[4]

Petitioner started working at the San Jose airport's weather station in 2004. Initially, he

---

(Lodged Docs. 5 through 9).
[2] <u>People v. Marsden</u>, 2 Cal.3d 118 (1970).
[3] The denials of petitioner's <u>Marsden</u> motions were challenged on appeal. The Court of Appeal affirmed the rulings. Lodged Doc. 14 at 10-15.
[4] This statement of facts is largely adapted from the opinion of the California Court of Appeal, Lodged Doc. 14. Both parties have adopted that statement, and the court's review of the trial transcript confirms its accuracy. Some details have been added.

worked five days a week, eight hours a day. In 2008, he began working four days a week, 10 hours a day. In October 2009, he reduced his weekly hours to 37. In November 2009, he reduced his hours to 30 hours, spread over three 10-hour shifts. Petitioner's supervisor, Thomas Chance, said petitioner was "the picture of stability" and "an ideal employee."

On December 11, 2009, petitioner asked Chance for the company doctor because his back was hurting him. His back would stiffen on the long drive from his home in Lathrop to work. Chance told petitioner there was no company doctor, but the company's insurance would cover him. Chance also told him if his back was bad, he should see a doctor.

On December 14, 2009, petitioner called in sick for work. Later that day, Chance called petitioner and gave him the company's insurance policy number. Petitioner, however, did not want the insurance information; he wanted the company doctor. Petitioner insisted on the company doctor, even though Chance told him there was not one.

On his next shift, December 16, petitioner asked Chance if he got the company doctor for him. Chance again told him to use the company insurance and go see a doctor. Petitioner took the insurance information. But on his next shift, December 18, he asked the same question, and Chance repeated his answer.

On the day of his next shift, December 21, petitioner called Chance and said he quit. When asked why, petitioner said he was not feeling well. He returned his security badge the following day, December 22. Petitioner was reluctant to use his badge or key to access the facility because he was no longer an employee, so Chance let him in to the premises. Chance believed petitioner wanted "to be precise," as in everything he did. Petitioner looked clean and well maintained at that time.

That same month, petitioner and his wife, Sherene, had dinner with his uncle, Niranjan Uppal, and Uppal's fiancée, Marie Saenz. Petitioner's and Sherene's behavior seemed different. Petitioner mumbled to himself and fidgeted with his fingers. Sherene seemed sad and acted afraid. Petitioner spoke with Uppal in the garage and asked him how to apply for unemployment and, if he got injured on his property, whether his homeowner's insurance would cover it. During that time, Sherene and Saenz had been talking at the table. When the men came in from the

3

1  garage, Sherene turned away from Saenz as if she had not been talking with her.  She went to the
2  kitchen sink and acted like she was doing something there.

3  On December 23, 2009, at around 12:49 a.m., San Joaquin County Sheriff's deputies were
4  dispatched to petitioner's home.  Petitioner's eight-year-old son opened the door to them.  He had
5  a blank stare and was covered in blood.  He let the deputies in, and petitioner's 10-year-old
6  daughter, who was still on the phone with the 911 dispatcher, told them her parents were upstairs.
7  The deputies noticed blood stains on the stairs.

8  When a deputy announced themselves, petitioner jumped out of a bedroom, holding a
9  knife in his right hand.  He was completely drenched in blood.  With their weapons drawn, the
10 deputies ordered petitioner a number of times to drop the knife.  Petitioner did not.  Several times,
11 he said, "Just shoot me."  He took a step towards one of the deputies, who fired his Taser and
12 subdued petitioner.  Petitioner had a laceration on his neck.  In a bedroom, deputies found the
13 body of petitioner's wife, Sherene.  She was fully clothed, and her clothes were extensively
14 soaked with blood.

15 The pathologist determined Sherene suffered three deep stab wounds in the front of her
16 neck that extended from the neck's junction with the submental triangle down to its junction with
17 the trunk.  The stab wounds indicated the stabbings had not been simple stabs in and out, but were
18 in and out with motion of the knife inside the body.  Sherene also had nine incised wounds in and
19 around her face, neck, and head.  In addition, she had numerous abrasions and contusions on her
20 lips and other body areas, as well as some defensive wounds.  Because the stabbings cut her
21 trachea and completely transected the jugular vein, she bled to death as well as drowned in her
22 own blood.  She was not dressed like someone who was going to bed.  Her wounds were not
23 consistent with having committed suicide, and she was not under the influence of any substance.
24 The presence of blood stains on many different surfaces indicated there had been some type of
25 struggle.

26 The defense presented no evidence in the guilt phase.  Instead, counsel cross-examined
27 law enforcement witnesses to highlight gaps in the investigation and in the forensic evidence, and
28 attempted to undermine the credibility of the pathologist (whose conclusions about Sherene's

wounds formed the primary basis of the prosecution's case for malice and intent to kill). In closing, counsel argued that the investigation had been biased toward confirming petitioner's guilt rather than determining whether someone else, such as an intruder, might have been responsible for the stabbing. She urged the jury to find that the charges had not been proved beyond a reasonable doubt.

    2. <u>Sanity Phase</u>

At the sanity phase, the defense presented the testimony of two court-appointed mental health experts who had been asked to opine on petitioner's sanity at the time he murdered his wife. John Chellsen, Ph.D., a clinical psychologist, and Dr. Kent Rogerson, a psychiatrist, both believed petitioner was insane when he killed his wife. Both testified that petitioner was incapable of knowing and understanding the nature and quality of his actions and their wrongfulness when he committed the crime.

Dr. Chellsen opined petitioner suffered from depression, and at the time of the murder, his depression had worsened to include psychotic symptoms such as hallucinations, disordered and delusional thinking, and a loss of contact with reality. Dr. Chellsen believed petitioner's condition might more accurately be categorized as schizoaffective disorder, which includes major depression along with symptoms of schizophrenia. He testified petitioner's disorder had improved since the murder to the moderate range of severity.

Dr. Rogerson believed petitioner had major depression with delusional and confused thinking. He testified petitioner began suffering from a sinus infection, headaches, and back pain in October 2009. These aliments affected his ability to sleep, and he became progressively more depressed. Petitioner began having suicidal thoughts, and he pulled away from doing things he normally did. Dr. Rogerson believed petitioner was depressed, delusional, and had no understanding of what was going on at the time of the crime.

Both expert witnesses believed petitioner was not malingering or faking his symptoms.

Detective Lawrence Gardiman testified for the prosecution. He had visited petitioner in the hospital later on the morning of the killing. He was told petitioner was not taking any medication at that time. He read petitioner his <u>Miranda</u> rights and asked him if he understood his

rights. Petitioner said "Yes" as to each right individually and as to his rights collectively. Detective Gardiman next asked petitioner if he wanted to talk about what happened. Petitioner said he would talk to Detective Gardiman the next day. The following day, Detective Gardiman again met with petitioner at the hospital. He again advised petitioner of his rights and asked if he understood them. Petitioner said he did, and that he wanted an attorney. The detective then left.

The prosecution presented no expert testimony in the sanity issue.

C. Outcome

At the conclusion of the guilt phase, the jury returned a verdict of not guilty of first degree murder and guilty of second degree murder. The weapon enhancement was found to be true. 2 CT 372, 382-384. Following the sanity phase, the jury found that petitioner was sane at the time of the murder. 2 CT 531, 536.

The trial court sentenced defendant to a prison term of 15 years to life, plus one year, consecutive, for the weapon enhancement. 3 CT 670-674, 678-679.

II.   Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on December 10, 2014. Lodged Doc. 14. The California Supreme Court denied review on March 11, 2015. Lodged Doc. 16.

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on April 27, 2016, presenting the single claim that is now before this court: ineffective assistance of trial counsel in failing to present mental state evidence at the guilt phase. Lodged Doc. 17. The California Supreme Court ordered an informal reply, which was filed on July 16, 2016. Lodged Doc. 18. Petitioner file a response to the informal reply. Lodged Doc. 19. The petition was denied by summary order, without comment or citation, on October 12, 2016. Lodged Doc. 20. The instant federal petition was thereafter timely filed.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

6

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 582 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

7

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. Richter, 582 U.S. at 102.

## DISCUSSION

I.     Petitioner's Ineffective Assistance of Counsel Claim and Pertinent State Court Record

Petitioner seeks federal habeas relief on the sole ground that he received ineffective assistance of trial counsel. Petitioner alleges that Deputy Public Defender Rose Cardoso performed deficiently and prejudicially by failing to present available mental state evidence at the guilt phase to negate malice and intent to kill, and to support jury instructions on lesser included manslaughter offenses. He contends that the evidence of mental impairment that was developed for purposes of competency and the sanity phase should have been presented at the guilt phase.

The petition is supported, as it was supported in the California Supreme Court, by the following exhibits:

- The January 2010 competency report of Gary L. Cavanaugh, M.D., finding petitioner not competent to stand trial;
- The September 2010 "Criminal Responsibility Evaluation" of clinical psychologist John A. Chellsen, Ph.D., opining that petitioner was insane at the time of the homicide;
- The August 2010 report of psychiatrist Kent E. Rogerson, M.D., opining that petitioner was insane at the time of the homicide.

1  ECF No. 1-1 (Attachments A-C).

2  Petitioner's fourth exhibit, ECF No. 1-1 (Attachment D), was presented to the California

3  Supreme Court by respondent in support of the informal reply.  This is the declaration of defense

4  counsel Rose Cardoso, who avers in pertinent part as follows:

> I recall discussing trial strategy in this case with my supervisor, Peter Fox, an experienced capital defense counsel.  I decided not to present a defense of diminished actuality, lack of malice, or of intent to kill in the guilt phase of Mr. Singh's trial for two primary reasons.  First, presenting all the mental defense evidence one time in the sanity phase would be a more persuasive use of this evidence, since the jury would not have already rejected it in the guilty phase.  Second, a mental defense would be inconsistent with Mr. Singh's statements to me that a burglar was responsible for his wife's murder.  My strategy in the guilt phase focused on the prosecution not meeting its burden because the police work regarding Mr. Singh's statements regarding a burglar was insufficient.

Lodged Doc. 18, Exhibit B; ECF No. 1-1 (Attachment D).

## II.    The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 692, 694 (1984).

The proper measure of attorney performance is objective reasonableness under prevailing professional norms.  <u>Id.</u> at 688.  Counsel's strategic choices are generally accorded deference, but only if those decisions are themselves reasonable and are based on reasonable investigations, research, and judgments.  <u>Id.</u> at 690-691.  "[C]ourts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions."  <u>Richter</u>, 582 U.S. at 109 (quoting <u>Wiggins v. Smith</u>, 539 U.S. 510, 526-27 (2003)).

Prejudice means that the error actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  <u>Strickland</u>, 466 U.S. at 693-94.  A "reasonable probability" is less than a preponderance.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995); <u>Strickland</u>, 466 U.S. at 693 (petitioner need not "show that counsel's deficient conduct more likely than not altered the

1  outcome in the case"). A reasonable probability is a probability sufficient to undermine
2  confidence in the outcome. Id. In assessing prejudice from deficient performance, the court must
3  consider all of trial counsel's unprofessional errors against "the totality of the evidence" adduced
4  at trial and in post-conviction proceedings. Id. at 695; Wiggins, 539 U.S. at 536; Williams v.
5  Taylor, 529 U.S. 362, 397 (2000).

     III.    The State Court's Ruling

As noted above, the California Supreme Court denied the claim without comment or citation. There are no reasoned lower court decisions denying the claim.

     IV.    Objective Reasonableness Under § 2254(d)

The question before this court is whether the California Supreme Court unreasonably denied petitioner's ineffective assistance of counsel claim in light of the record before it. 28 U.S.C. § 2254(d); Pinholster, 563 U.S. at 181-182. Unless the state court's disposition of the claim was not merely incorrect but objectively unreasonable under Strickland, this court may not independently evaluate whether counsel's decision not to present evidence at the guilt phase was sufficiently below professional norms to violate Sixth Amendment standards, or whether petitioner might have achieved a more favorable result had she done as petitioner now urges.

Because the state court denied the claim on the merits but without explanation, this court must determine whether there is any objectively reasonable basis for a denial under clearly established federal law. Richter, 582 U.S. at 102. A Strickland claim may be denied on either performance or prejudice grounds; a reviewing court need not address both prongs of the analysis if it finds petitioner's showing insufficient as to one of them. Strickland, 466 U.S. at 697. For the reasons that follow, the undersigned concludes that the California Supreme Court could have reasonably denied the petition before it on either prong of the Strickland standard.

     A.    The State Court Could Reasonably Have Found That Counsel's Performance Did Not Violate the Sixth Amendment

The California Supreme Court was required to apply a "strong presumption" that counsel's representation fell within the "wide range" of reasonable professional assistance. Strickland, 466 U.S. at 689. It was petitioner's burden to overcome this presumption. Richter,

562 U.S. at 105; Strickland, 466 U.S. at 690.  It cannot have been unreasonable for the California Supreme Court to conclude that petitioner failed to meet this burden, because the record establishes that trial counsel made a deliberate decision about defense strategy after investigating mental state issues and considering alternative theories of defense.

Petitioner cannot establish constitutionally inadequate performance merely by identifying an alternative defense strategy and arguing its superiority; he must show that the choice made "so undermined the proper functioning of the adversarial process" that petitioner was denied a fair trial.  Strickland, 466 U.S. at 686.  It is of course true that strategic choices are not immune from challenge under Strickland; they must be reasonable.  Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997).  But as the Supreme Court has explained,

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

Strickland, 466 U.S. at 690.

This is not a case in which counsel failed to investigate or to present an available mental state defense.  Cf. Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002), cert. denied, 539 U.S. 958 (2003).  The petition makes no allegation that counsel's mental state investigation was inadequate in scope or that additional evidence existed.  The petition challenges only counsel's strategic decision about how to use the evidence of petitioner's psychiatric impairment that was available through Drs. Chellsen and Rogerson.[5]  Petitioner presents no additional expert opinion specific to guilt phase issues (diminished actuality, lack of malice, etc.) but relies exclusively on the evidence that was developed in the sanity context to demonstrate the general availability of mental state defenses that could have been presented at the substantive offense phase.

---

[5] Petitioner also relies on the competency report provided by Dr. Cavanaugh.  Because Dr. Cavanaugh's evaluation was limited to petitioner's competence to stand trial, and did not address petitioner's mental state at the time of the crime, it has little probative value as to criminal liability and possible defenses.  Dr. Cavanaugh's diagnostic opinion that petitioner suffered from major mental illness was generally consistent with that of Drs. Chellsen and Rogerson.  Because his opinion adds nothing to the Strickland claim, however, it need not be separately discussed in the court's analysis.

There is nothing facially unreasonable about an attorney's decision to pursue a verdict of not guilty by reason of insanity when two court-appointed experts have found the defendant was insane at the time of the homicide and there are no contrary opinions in the record. Indeed, the insanity case available here was quite strong. The fact that it was not successful does not mean that counsel was unreasonable for pursuing it to the exclusion of a mental state defense at the guilt phase. See Bell v. Cone, 535 U.S. 685, 702 (2002) (warning against judging counsel's performance in "the harsh light of hindsight" following jury's rejection of defense position (citing Strickland, 466 U.S. at 689)).

It is undisputed that Ms. Cardoso made a deliberate, strategic decision to present mental state evidence at the sanity phase only. She did so after discussion with her supervisor, who had capital case experience and thus was presumably knowledgeable about mental state defenses. See ECF No. 1-1, Attachment D, (Declaration of Rose Cardoso). It is clear from her declaration that counsel considered the available alternatives. Id. Petitioner has identified no evidence to the contrary. Under Strickland, this makes her decision "virtually unchallengeable." 466 U.S. at 690. The undersigned will nonetheless briefly address each of counsel's stated reasons for her strategic choice, because the California Supreme Court's reliance on a patently unreasonable justification could nonetheless amount to an unreasonable application of Strickland.

First, Ms. Cardoso explained that "presenting all the mental defense evidence one time in the sanity phase would be a more persuasive use of this evidence, since the jury would not have already rejected it in the guilty phase." ECF No. 1-1 (Attachment D). Accepting this justification as within the wide range of adequate performance was not objectively unreasonable. An insanity defense is a complete defense to criminal liability rather than grounds for conviction on a lesser degree of murder or lesser included homicide offense, and both court appointed experts had concluded that petitioner was insane. Accordingly, insanity constituted a strong affirmative defense. Presenting the same testimony at the guilt phase would have meant that if the jury rejected it as to the mens rea element(s) of murder, repeating it as to sanity would almost certainly have been futile. Such an approach would have risked undermining what may have appeared at the time to be the best chance of a result other than a life imprisonment for murder. See

Strickland, 466 U.S. at 689 (counsel's choice must be evaluated from counsel's perspective at the time).

Ms. Cardoso had a second stated reason for not pursuing a guilt phase mental state defense: it would have been inconsistent with her strategy to raise a reasonable doubt by focusing on police bias and a slipshod investigation that assumed petitioner's guilt. As already noted, counsel decided on a defense theory after investigating the mental state evidence and weighing the options. A reasonable doubt strategy—especially one floating the theoretical possibility of an undiscovered intruder—may have been a weak defense, but that does not mean an alternative strategy would have been superior. The chosen approach gave the defense two shots at a not guilty verdict: (1) acquittal based on reasonable doubt at the guilt phase and, (2) if the jury convicted, an alternative defense that could nonetheless result in a judgment of not guilty by reason of insanity. A state court reasonably rejects a Strickland claim that is based on the decision to pursue a reasonable doubt defense, rather than rely on expert testimony, absent a complete failure to investigate or to make a reasonable decision that specific avenues of investigation are not necessary. Richter, 562 U.S. at 109. That is simply not the case here.[6]

Moreover, presenting the mental health experts at the substantive offense phase would have been risky in ways obvious to any reasonably competent criminal defense lawyer. Putting the doctors on the witness stand would have opened the door to potentially damaging information that otherwise could be kept from the jury at the guilt phase: evidence regarding petitioner's comprehension and invocation of his Miranda rights in the hospital, which the prosecutor could be expected to argue demonstrated an intact cognitive state; statements petitioner had made to the doctors about the possible presence of an intruder in the house and the possibility that his wife attempted suicide[7]; and petitioner's own preliminary hearing testimony in which (a) his recall of

---

[6] In Richter, supra, the U.S. Supreme Court reversed the Ninth Circuit's findings of unreasonable state court adjudication and unreasonable attorney performance on facts much more favorable to the petitioner than are presented here. In Richter, counsel did not even consult with any experts before deciding to pursue a reasonable doubt theory rather than present expert testimony on an exoneration theory. Here counsel not only had expert opinion evidence, she used it.

[7] See ECF No. 1-1, Attachment B (Declaration of Dr. Chellsen); RT 1022 (testimony of Dr. Chellsen); ECF No. 1-1, Attachment C (Declaration of Dr. Rogerson); RT 1132 (testimony of Dr.

1    events was inconsistent with later representations of complete amnesia as to the stabbing, and (b)

2    he testified that his wife had attacked him with the knife, he tried to take the knife away from her,

3    and both of them were injured in the course of the ensuing struggle.[8]

4          All of this problematic evidence would have been admissible to impeach the experts

5    and/or admissible in rebuttal.[9] The preliminary hearing testimony would have been particularly

6    damaging. Given the autopsy conclusions regarding the nature of Sherene's wounds, counsel

7    may reasonably have worried that a jury would interpret the petitioner's story about a struggle

8    over the knife as a fabrication reflecting consciousness of guilt. When expert testimony might

9    open the door to damaging information, it is not unreasonable for a state court to deny a

10   Strickland claim predicated on the failure to present it. See Richter, 562 U.S. at 108.

11         For all of these reasons, it would not have been objectively unreasonable for the California

12   Supreme Court to conclude that petitioner had failed to overcome the presumption that counsel's

13   strategic choice fell within the wide range of professional competence.

14         B.  The State Court Could Reasonably Have Found That Petitioner Failed to Establish

15             Prejudice

16         To demonstrate prejudice, petitioner must establish a reasonable likelihood of a more

17   favorable result had counsel done as he now urges. Strickland, 466 U.S. at 696. Petitioner was

18   charged with an open count of murder, and he was convicted of murder in the second degree.

19   Accordingly, he can show prejudice only if presentation of the mental state evidence at the guilt

20   phase would, with reasonable likelihood, have led to either outright acquittal or a manslaughter

21   verdict. Those are the only possible outcomes in a murder case that are more favorable than

22   second degree murder.

23         The bottom line here is that the jury rejected the testimony of Drs. Chellsen and Rogerson

24   at the sanity phase, and there is no reason to think they would have credited it at the guilt phase.

25   At the sanity phase, both doctors provided detailed, expertly elicited testimony about their

---

Rogerson).

[8] See 1 CT 264 – 2 CT 281 (preliminary hearing testimony of Baljit Singh).

[9] Indeed, as discussed below regarding prejudice, this evidence did come in via impeachment and/or as rebuttal during the sanity phase.

14

diagnoses of petitioner and their reasons for concluding that he was so out of touch with reality at the time of the homicide that he had not known what he was doing.[10] Both doctors were vigorously and effectively cross-examined. They were impeached with inconsistencies between what petitioner had told them and what he said at the preliminary hearing, and with inconsistencies between how he presented himself to them and how he presented himself to others during the relevant time frame.[11] Moreover, through cross-examination of the experts the jury learned the substance of petitioner's preliminary hearing testimony: that his wife had come at him with the knife, and that they were both injured when they fell during their ensuing struggle. This information was not consistent with the pathologist's testimony regarding the victim's wounds. Accordingly, it both undermined the doctors' conclusions regarding petitioner's amnesia and also suggested that petitioner had made up a story about how his wife died. The undersigned does not mean to say this was actually the case, only that the impeachment of the experts introduced information that hurt the defense in multiple ways.

In this case we need not speculate about how a theoretical jury would evaluate a mental state defense. The fact that the actual jury rejected the conclusions of the only two testifying experts at the sanity phase means that, in light of the evidence as a whole, they did not find those experts or their opinions to be credible. There is no other explanation for the sanity verdict, and no grounds for a conclusion that the jury would have made a different credibility determination at the guilt phase. In affirming the sufficiency of the evidence on sanity as a matter of California law, the Court of Appeal highlighted the impeachment of the experts, the evidence of petitioner's rational behavior shortly before and after the homicide, and petitioner's actions reflecting

---

[10] The testimony of Dr. Chellsen is found at 4 RT 975-1076. The testimony of Dr. Rogerson is at 4 RT 1085 – 5 RT 1230.

[11] Impeachment focused on matters such as the inconsistencies between petitioner's statements to the doctors that he did not remember the stabbing and his testimony about the stabbing at the preliminary hearing; inconsistency between petitioner's report to Dr. Chellson of auditory hallucinations and his denial of hallucinations at the hospital; and inconsistency between the doctors' conclusions about petitioner's mental state on the night of the murder and the cogent directions petitioner gave his 8-year old son that night to call 911 and then call the children's grandparents. Rebuttal was presented in the form of Detective Gardiman's testimony regarding petitioner's responses to Miranda advisements and invocation of the right to counsel.

consciousness of guilt. Lodged Doc. 14 at 6-10. The same total evidentiary picture makes it less than reasonably likely that a guilt-phase mental state defense would have succeeded.

Even assuming that both doctors would have provided guilt phase testimony from which the jury could conclude that, due to mental illness, petitioner did not act with premeditation or deliberation,[12] that conclusion would negate only first degree murder liability. See Cal. Penal Code § 189(a). The jury rejected first degree murder even without the mental state evidence, so this obviously does not demonstrate prejudice. Acquittal of second degree murder would have required the jury to find insufficient evidence of malice, either express (intent to kill) or implied (subjective awareness of engaging in conduct that endangers the life of another).[13] The undersigned will accept for purposes of discussion the legal correctness and strategic viability of petitioner's theories about the use of mental state evidence to raise a reasonable doubt about malice. However, the fact remains that this outcome is reasonably likely only to the extent it is reasonably likely that the jury would have accepted the doctors' conclusions about the severity of petitioner's illness and the degree to which it affected his functioning and his subjective understanding at the time of the homicide. In light of the impeachment evidence already described, it would not have been unreasonable of the California Supreme Court to conclude that the likelihood of such an outcome was less than substantial. See Strickland, 466 U.S. at 693 (the likelihood of a different result must be substantial, not just conceivable).

As for the likelihood of a manslaughter verdict based on mental health evidence, this court is bound by the conclusion of the California Court of Appeal that there was no evidence at petitioner's trial which supported the giving of manslaughter instructions. See Lodged Doc. 14 (Opinion on direct appeal) at 21-22 (holding that the evidence did not justify giving instructions on voluntary or involuntary manslaughter); see also Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (federal court must accept correctness of state court's ruling on matters of state law). Nothing in

---

[12] As petitioner points out, the jury was concerned with the meaning of "deliberately," as reflected in a note seeking clarification of the definition provided in the instructions. See 2 CT 391.

[13] See Cal. Penal Code § 188; see also People v. Watson, 30 Cal. 3d 290, 296-97 (1981); People v. Knoller, 41 Cal. 4th 139, 143 (2007).

the expert reports or the sanity phase testimony suggests the existence of facts not introduced at the guilt phase which would have supported sudden quarrel or heat of passion, unreasonable self-defense, commission of a life-threatening misdemeanor, or criminal negligence.  <u>See</u> Lodged Doc. 14 at 21-22 (enumerating bases for manslaughter liability).  On the facts of this case, petitioner's mental state evidence does not support the likelihood of a manslaughter verdict.

For all these reasons, it would not have been unreasonable for the California Supreme Court to conclude that petitioner had failed to establish the reasonable likelihood of a more favorable result had counsel presented Drs. Chellsen and Rogerson at the guilt phase.

## CONCLUSION

The California Supreme Court's denial of relief was not objectively unreasonable under <u>Strickland</u>, whether that court based its decision on (1) petitioner's failure to overcome the presumption that counsel's performance fell within the range of competent representation, or (2) petitioner's failure to demonstrate prejudice.  Accordingly, relief in this court is barred by 28 U.S.C. § 2254(d).  Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  <u>See</u> 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 6, 2020

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE